**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RAYNE S. FEDDER,**

      **Plaintiff,**

      **v.**
                              **Civil Action 2:23-cv-627**
                              **Judge Sarah D. Morrison**
                              **Magistrate Judge Chelsey M. Vascura**

**OHIO MEDICAL**
**TRANSPORTATION, INC.,**

      **Defendant.**

## ORDER and REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff's Objections (ECF No. 10) to the undersigned's April 19, 2023 Report and Recommendation (ECF No. 6), which recommended dismissal of Plaintiff's Complaint in its entirety for failure to state a claim on which relief can be granted under 28 U.S.C. § 1915(e)(2). In light of Plaintiff's Objections, the undersigned **VACATES** the April 19, 2023 Report and Recommendation (ECF No. 6) and re-screens Plaintiff's Complaint as required by 28 U.S.C. § 1915(e)(2) to identify cognizable claims and to recommend dismissal of Plaintiff's Complaint, or any portion of it, which is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2). Having performed the screen, for the reasons that follow, Plaintiff **MAY PROCEED** on her "regarded-as" disability discrimination claim under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"). The undersigned **RECOMMENDS** that the Court **DISMISS** Plaintiff's remaining claims pursuant to § 1915(e)(2).

## I.     BACKGROUND

Plaintiff, a transgender woman, alleges that she was employed by Defendant Ohio Medical Transportation, Inc., as an emergency medical technician ("EMT") from March 14, 2022, through May 3, 2022. (Compl. ¶¶ 2, 201–07, ECF Nos. 1-2, 1-3.) Plaintiff alleges that she was subjected to harassment and disparate treatment by her coworkers and supervisors, in the form of, among other things, having to listen to racist, ableist, misogynistic, and queermisic slurs; patronizing suggestions about her career, and discipline regarding her social media activity. (*See* Compl., *passim.*) In particular, Plaintiff was disciplined for posting material critical of law enforcement and for a post that made a joke referencing a conversation Plaintiff had overheard between other coworkers. (*Id.* at ¶¶ 18, 43, 48.)

On the evening of April 19, 2022, Plaintiff and her partner were dispatched to O'Bleness Memorial Hospital to transport a psychiatric patient to Columbus Springs Dublin. (*Id.* at ¶¶ 104, 110.) Plaintiff felt that O'Bleness staff were not performing their jobs properly and voiced criticisms of the use of an armed security officer ("asking what he even needed that gun holstered to his hip for, and quipp[ing] that he probably did not know how to operate it") and the poor quality of the paperwork provided by the nursing staff ("Plaintiff does not remember saying that the report from the charge nurse about the patient was 'shitty,' though Plaintiff does concede that the sentiment was there.") (*Id.* at ¶¶ 115, 185.) Plaintiff also alleges that the desk attendant asked how Plaintiff was doing, and Plaintiff said "something about how she would be doing much better if she passed or if she did not work with a bunch of creepy bigots, or something of the sort." (*Id.* at ¶ 117.) After some resistance by the patient, Plaintiff, her partner, and other O'Blenness staff were able to buckle the patient to a stretcher and the patient was transported without further incident. (*Id.* at ¶¶ 127–137.)

2

On the morning of April 20, 2022, an O'Blenness manager contacted Defendant to complain about Plaintiff's "unprofessional" and "disrespectful" behavior. (*Id.* at ¶¶ 142–44, 151.) The O'Blenness manager reported that a doctor present during Plaintiff's pickup felt that Plaintiff might need a "blue gown" (*i.e.*, involuntary hospitalization for a psychiatric emergency) because Plaintiff was making "off the wall comments" and saying "unnecessary" and "oddly inappropriate things." (*Id.* at ¶ 305.) A nurse who was present during Plaintiff's pickup also stated in an email forwarded to Defendant that Plaintiff had been "rude and inappropriate" and exhibited "rude, bizarre, and erratic behavior," and that the nurse "might have reservations about releasing a patient" to Plaintiff. (*Id.* at ¶ 306.)

Later that day, Defendant placed Plaintiff on administrative leave with pay pending Defendant's investigation of the O'Blenness staff's complaints. (*Id.* at ¶ 168–69.) On May 3, 2022, Plaintiff attended a meeting at Defendant's office, during which Defendant terminated her employment based on the complaints by O'Blenness staff. (*Id.* at ¶¶ 201–07.)

Plaintiff filed a charge with the EEOC, alleging harassment and disparate treatment discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and amending the charge to add a "regarded-as" disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"). (Amended Charge of Discrimination, ECF No. 1-4, PAGEID #114.) In its response to Plaintiff's EEOC charge, Defendant relied on the O'Blenness staff complaints as the reason for terminating Plaintiff's employment, noting that "Plaintiff's comments were so disturbing that a doctor at the hospital thought that [the Plaintiff] might even need to be evaluated by the hospital's mental health service." (Compl. ¶ 322, ECF No. 1-3.) Plaintiff obtained a Right to Sue

letter on November 21, 2022, and commenced this lawsuit on February 14, 2023. (ECF No. 1-4,

PAGEID #115; ECF No. 1.)

## II.  STANDARD OF REVIEW

Congress enacted 28 U.S.C. § 1915, the federal *in forma pauperis* statute, seeking to

"lower judicial access barriers to the indigent." *Denton v. Hernandez*, 504 U.S. 25, 31 (1992). In

doing so, however, "Congress recognized that 'a litigant whose filing fees and court costs are

assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from

filing frivolous, malicious, or repetitive lawsuits.'" *Id*. at 31 (quoting *Neitzke v. Williams*, 490

U.S. 319, 324 (1989)). To address this concern, Congress included subsection (e) as part of the

statute, which provides in pertinent part:

> (2) Notwithstanding any filing fee, or any portion thereof, that may have been paid,
> the court shall dismiss the case at any time if the court determines that—
>
>     * * *
>
>     (B) the action or appeal—
>
>         (i) is frivolous or malicious; [or]
>
>         (ii) fails to state a claim on which relief may be granted . . . .

28 U.S.C. § 1915(e)(2)(B)(i) & (ii); *Denton*, 504 U.S. at 31. Thus, § 1915(e) requires *sua sponte*

dismissal of an action upon the Court's determination that the action is frivolous or malicious, or

upon determination that the action fails to state a claim upon which relief may be granted.

To properly state a claim upon which relief may be granted, a plaintiff must satisfy the

basic federal pleading requirements set forth in Federal Rule of Civil Procedure 8(a). *See also*

*Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (applying Federal Rule of Civil Procedure

12(b)(6) standards to review under 28 U.S.C. §§ 1915A and 1915(e)(2)(B)(ii)). Under Rule

8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, Rule 8(a) "imposes legal and factual demands on the authors of complaints." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

Although this pleading standard does not require "detailed factual allegations, a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint will not "suffice if it tenders naked assertion devoid of further factual enhancement." *Id.* (cleaned up). Instead, in order to state a claim upon which relief may be granted, "a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id*. (cleaned up). Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *Flagstar Bank*, 727 F.3d at 504 (citations omitted). Further, the Court holds *pro se* complaints "to less stringent standards than formal pleadings drafted by lawyers." *Garrett v. Belmont Cty. Sheriff's Dep't*, 374 F. App'x 612, 614 (6th Cir. 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). This lenient treatment, however, has limits; "courts should not have to guess at the nature of the claim asserted." *Frengler v. Gen. Motors*, 482 F. App'x 975, 976–77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

### III. ANALYSIS

Plaintiff advances claims for hostile work environment and disparate treatment, both on the basis of sex, under Title VII, as well a claim for disability discrimination, on the basis of being regarded as having a mental or behavioral health impairment, under the ADA. Plaintiff's Complaint sufficiently pleads a "regarded-as" disability discrimination claim under the ADA,

and Plaintiff may therefore proceed on that claim. The undersigned considers Plaintiff's remaining claim in turn.

**A.      Plaintiff has not sufficiently pleaded a Title VII hostile work environment claim.**

To establish a prima facie case of a hostile work environment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 300 (6th Cir. 2021) (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

Here, as to the first element, Plaintiff is a member of the protected classes of women and transgender individuals. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020) (discrimination against a person for being transgender is sex discrimination for purposes of Title VII). Further, as to the second and third elements, Plaintiff was subject to unwelcome harassment that was based on sex. Plaintiff alleges four specific instances in which her coworkers made anti-trans comments or badgered her with unwelcome questions or comments about her transgender status. (Compl. ¶¶ 23–27, 30, 88, 105, ECF No. 1-3.)

The fourth element, whether the charged sexual harassment created a hostile work environment, requires an examination of the totality of the circumstances beyond just the four clear instances of sexual harassment identified by Plaintiff to determine whether "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (cleaned up); *see also Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). This analysis has both an objective and subjective component:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21–22.

Plaintiff sufficiently alleges that she subjectively perceived the environment to be abusive. (*See* Compl. ¶ 361, ECF No.1) (alleging, among other things, "issues with anxiety, mental health degradation, emotional exhaustion, sleep difficulties, feelings of hopelessness and nihilism about her job, gender dysphoria, disassociation, and emotional hypochondriasis" as a result of the harassment she suffered).

As to whether Plaintiff's work environment was objectively hostile and abusive, the Supreme Court "has provided a non-exhaustive list of factors to consider when deciding whether a hostile work environment exists, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008) (quoting *Harris,* 510 U.S. at 23). Mindful that the Court must consider the totality of the circumstances, the undersigned reviews the following allegations from Plaintiff's Complaint:

    (1)    A supervisor (Mr. Gruenberg) told Plaintiff, in response to her plans to become a paramedic and eventually a nurse, and to seek out emergency EMT work, that Plaintiff should stay an EMT longer so that she can learn to give quality CPR, and discouraged Plaintiff from working emergency EMT shifts in a particular county that the supervisor described as being "full of 'tough guys,'" and also referred to a period of high crime and arson in a particular neighborhood as the "war years" (Compl. ¶¶ 9–10, 360, ECF Nos. 1-2, 1-3);

    (2)    A Field Training Officer (Mr. Wasch) and his partner "were rude and off-putting to the plaintiff, and seemed discomfited by her presence" (*Id.* at ¶¶ 16, 360);

(3)     A new coworker (Beth) asked Plaintiff if she was transgender, and persisted in asking Plaintiff "uncomfortable and invasive questions on the topic of Plaintiff's transition, sexuality, relationship status, and assigned gender at birth/transfers of plaintiffs romantic and sexual partners" and making unwelcome comments even after Plaintiff stated that these questions were inappropriate (*Id.* at ¶¶ 23–27, 360);

(4)     Plaintiff's direct supervisor (Mr. Kelley) told two of Plaintiff's coworkers (Beth and Mr. Williams) to "keep an open mind" when working with Plaintiff, which Plaintiff construes as the supervisor "outing" Plaintiff as transgender and "othering" her to her coworkers (*Id.* at ¶¶ 25, 37, 360);

(5)     A coworker (Mr. Williams) on one occasion made a quip in front of Plaintiff and a few other personnel that a female paramedic "stands up to pee" as an insult (*Id.* at ¶¶ 30, 360);

(6)     Plaintiff's direct supervisor (Mr. Kelley) "acted very strange and off-putting toward the Plaintiff. Plaintiff at the time chalked it up to awkwardness." (*Id.* at ¶¶ 35, 360);

(7)     Plaintiff was disciplined for her social media postings, which Plaintiff construes as her supervisors "allow[ing] and encourag[ing]" her coworkers to "screenshot[ ] and stalk[ ]" Plaintiff's Facebook profile and postings "in way that constantly violated her boundaries" (*Id.* at ¶¶ 44, 77, 93, 360);

(8)     A supervisor (Mr. Gruenberg) unnecessarily and unusually sat in on disciplinary meetings with Plaintiff, which Plaintiff alleges is infantilizing and intimidating in a way characteristic of sex-based discrimination (*Id.* at ¶¶ 44, 66, 77, 93, 360);

(9)     A supervisor (Mr. Gruenberg) implied, when disciplining Plaintiff concerning a social media post, that the fictional abusive boyfriend in the post "was more worthy of respect and dignified treatment" than Plaintiff (*Id.* at ¶¶ 46, 360);

(10)    Defendant's social media policies were unreasonable, weren't clearly communicated, and shifted quickly throughout time (*Id.* at ¶¶ 78–79, 360);

(11)    Coworkers did not attempt to address their concerns about Plaintiff's supposedly offensive conduct directly with her before involving management (*Id.* at ¶¶ 73, 85, 92, 360);

(12)    A coworker (Mr. Williams) on one occasion repeatedly deadnamed another transgender coworker and only stopped after Plaintiff made "repeated requests and exhausting explanations" (*Id.* at ¶¶ 88, 360);

(13)    A police officer and paramedic (Luis) who worked for Plaintiff's employer (but not directly with Plaintiff) liked one of Plaintiff's Facebook posts, which Plaintiff construes as "stalking" her profile, and also teased Plaintiff on one occasion by setting the speed limiter alarm in her ambulance to 40 miles per hour, which made the alarm constantly go off (*Id.* at ¶¶ 89, 108, 360);

(14)     Her supervisors (Mr. Gruenberg and Mr. Kelley) rejected Plaintiff's request that her coworkers be encouraged to block Plaintiff's social media profile if they were offended by its content, or that Plaintiff be given a list of all of Defendant's employees so Plaintiff could block each of them (*Id.* at ¶¶ 97–100, 360); and

(15)     A coworker (Mr. Williams) on one occasion "defended Plaintiff's supervisor [Mr. Kelley] for his hostile campaign and the bigoted views of Plaintiff's coworkers in a dehumanizing way, following an excusing of this behavior because he felt Plaintiff did not look feminine enough to 'pass'" (*Id.* at ¶¶ 105, 360).

Importantly, Title VII is not a "general civility code," *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, (1998) (citation omitted), and it is therefore "important to distinguish between harassment and discriminatory harassment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000). Few of Plaintiff's harassment allegations relate directly to Plaintiff's sex or transgender status. And although harassment that is not explicitly sexual in nature can sometimes constitute harassment on the basis of sex, Plaintiff must allege facts sufficient to create an inference that the non-sexual harassment was motivated by discriminatory animus on the basis of sex. *See Williams*, 187 F.3d at 565–66 (instances in which the female plaintiff was ostracized, when others were not, combined with the use of anti-female epithets, created an inference that the plaintiff's gender was the motivating impulse for her coworker's non-sexual harassment). In other words, harassment that is significant for Title VII purposes is that which "would not occur but for the employee's gender." *Id.* at 565.

Here, Plaintiff's allegations do not create a plausible inference that her coworkers' and supervisors' non-sexual harassment (acting "rude and off-putting," reporting her social media posts as offensive, issuing disciplining for her social media activity, and lowering the speed limiter alarm in her ambulance) was motivated by anti-female or anti-transgender animus. Although Plaintiff alleges that coworkers Beth and Mr. Williams harassed her specifically in relation to her transgender status, there are no allegations in Plaintiff's Complaint to suggest that anti-transgender animus was shared by her supervisors Mr. Kelley and Mr. Wasch, or by her

coworker Luis, who engaged in harassment that was not expressly tied to Plaintiff's sex. This pattern stands in contrast to *Williams*, in which at least some of the perpetrators of non-sexual harassment were the same individuals who used anti-female epithets. *See* 187 F.3d at 564–65. Moreover, the plausible inference as to alleged harassment related to Plaintiff's social media activity is that those actions were taken not because of Plaintiff's sex, but because of her posts reflecting anti-law-enforcement views, or her post referencing an overheard conversation between coworkers. (*See* Compl. ¶¶ 44, 73, 77–79, 85, 92–93, 97–100, ECF No. 1-3.)

As to Mr. Kelley's entreaty to Beth and Mr. Williams to "keep an open mind" when working with Plaintiff (*id.* at ¶¶ 25, 37), Plaintiff's allegations do not support an inference that this statement was made with anti-transgender animus. If this statement can be read to relate to Plaintiff's sex, the plausible inference is that Mr. Kelley was asking Plaintiff's coworkers to *not* treat her differently based on her transgender status—the very opposite of anti-transgender animus.

This leaves the four instances in which Beth or Mr. Williams made anti-transgender remarks or badgered Plaintiff with unwelcome questions or comments about her transgender status, as well as three other incidents that the undersigned will assume for the sake of argument constitute sex-based harassment: Mr. Gruenberg's discouraging Plaintiff from working in particular county full of "tough guys," Mr. Gruenberg's sitting in on Plaintiff's disciplinary meetings (when he did not typically do so for other employees), and Mr. Gruenberg's implication, when disciplining Plaintiff concerning a social media post, that the fictional abusive boyfriend in the post "was more worthy of respect and dignified treatment" than Plaintiff.

Applying the non-exhaustive list of factors to consider as outlined in *Grace* and *Harris*, the undersigned finds the discriminatory conduct to be relatively frequent, given Plaintiff's

10

tenure of less than two months in Defendant's employ. However, only a few of these instances can be characterized as severe or unreasonably interfering with Plaintiff's work performance (*i.e.*, when Beth or Mr. Williams persisted in harassing Plaintiff despite her requests to cease their questions or comments), and none were physically threatening or humiliating. On balance, the undersigned does not find that these allegations reflect an objectively hostile or abusive environment due to sexual harassment.

Even if Plaintiff's allegations established an objectively hostile work environment, Plaintiff's allegations do not satisfy the employer liability element. Employers can be liable for the harassment of their employees in two ways: (1) if the harasser is the plaintiff's supervisor, the employer is vicariously liable through principles of agency and respondeat superior; or (2) if the harasser is the plaintiff's coworker, without supervisory power over the plaintiff, the employer may be directly liable if the employer was negligent with respect to the offensive behavior. *Vance v. Ball State Univ.*, 570 U.S. 421, 427–28 (2013). Here, Plaintiff alleges harassment by both her supervisors (Mr. Gruenberg) and her coworkers (Beth and Mr. Williams); however, Plaintiff does not allege that she ever reported her coworker's harassment to management. Indeed, Plaintiff alleges that "she was reluctant to report events that were part of the hostile work environment she worked in" because she feared her coworkers would dislike her if she reported their harassment. (Compl. ¶ 331, ECF No. 1-3.) Further, with the exception of Mr. Williams' "stands up to pee" comment, it appears that no one other than Plaintiff was present when Beth and Mr. Williams' harassment occurred. (*See id.* at ¶¶ 23–27, 88, 105.) Without alleging that Defendant knew or should have known about Plaintiffs' coworkers' harassment, Plaintiff cannot show that Defendant was negligent in failing to correct it. *See, e.g., Jackson v.*

11

*Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). Defendant therefore cannot be held liable for harassment by Plaintiff's coworkers.

As to Mr. Gruenberg's alleged harassment, which the undersigned again assumes only for the sake of argument constitutes harassment on the basis of sex, that harassment is not sufficiently frequent, severe, physically threatening or humiliating, or interfering to constitute harassment forbidden by Title VII. *See*, *e.g.*, *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 570 (6th Cir. 2021) (finding five incidents of verbal comments about the plaintiff's physical appearance, including her breasts, insufficient to satisfy the "severe or pervasive" element of her Title VII hostile work environment claim).[1] Accordingly, the undersigned recommends that Plaintiff's Title VII hostile work environment claim be **DISMISSED**.

**B.      Plaintiff has not sufficiently pleaded a Title VII disparate treatment claim.**

Title VII makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In order to establish a prima facie case of discrimination on the basis of her sex or transgender status, Plaintiff must prove (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position in question; and (4) she was treated differently from similarly situated individuals outside of her protected class. *See Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[1] Although *Williams* dictates that Courts may not separate harassment by coworkers from that by supervisors in evaluating the fourth element of hostile work environment, *Williams* acknowledges that such separation is appropriate when considering the fifth element of employer liability. *See* 187 F.3d at 562–63.

Here, Plaintiff alleges she was terminated on the basis of her sex and/or transgender status. But Plaintiff cannot satisfy the fourth element of her prima facie case, because she has not alleged that any similarly situated male or cisgender employees were treated more favorably. Indeed, Defendant's stated basis for terminating Plaintiff's employment was the O'Blenness staff's complaint regarding Plaintiff's rude, unprofessional, and erratic behavior. Plaintiff has not identified any other employees who were the subject of third-party complaints. And although Plaintiff alleges that both she and several of her coworkers made verbal comments or social media posts that others found offensive, and that she alone was singled out for discipline, Plaintiff does not allege that she or anyone else ever complained about her coworkers' offensive comments or posts. In contrast, Defendant received at least one complaint about Plaintiffs' social media posts concerning law enforcement and an overheard conversation between Plaintiff's coworkers. Because Plaintiff has failed to identify any similarly situated employees outside her protected class who were treated more favorably, the undersigned recommends that Plaintiff's Title VII disparate treatment claim be **DISMISSED**.

## IV.    DISPOSITION

For the foregoing reasons, Plaintiff **MAY PROCEED** on her "regarded-as" disability discrimination claim under the ADA. The undersigned **RECOMMENDS** that the Court **DISMISS** Plaintiff's remaining claims pursuant to § 1915(e)(2).

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo*

13

determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE